**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Vidal Figueroa, | : | Case No. 1:09CV2793 |
| Plaintiff, | : | |
| v. | : | |
| Commissioner of Social Security, | : | **MAGISTRATE'S REPORT AND RECOMMENDATION** |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of Defendant's final determination denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq*. Pending are the parties' briefs on the merits and Plaintiff's Reply (Docket Nos. 16, 21 & 24). Based upon the evidence that follows, the Magistrate recommends that the Court remand the case to the Commissioner pursuant to sentence four of 42 U. S. C. § 405(g).

**I. PROCEDURAL BACKGROUND**

On August 7, 2006, Plaintiff filed applications for a period of disability, DIB and SSI, alleging that he became disabled on June 28, 2006 (Docket No. 10, Exhibit 5, pp. 2 - 4 of 12; 7 - 9 of 12). Plaintiff's requests for SSI and DIB benefits were denied initially and upon reconsideration (Docket No.

10, Exhibit 4, pp. 2- 5, 10 - 15 of 36).  On March 26, 2009, Administrative Law Judge (ALJ) Mark M. Carissimi convened an administrative hearing at which Plaintiff, represented by counsel, a Spanish interpreter and Vocational Expert (VE) Brett Salkin, appeared in person (Docket No. 10, Exhibit 2, p. 19 of 38).  On May 7, 2009, the ALJ rendered an unfavorable decision (Docket No. 10, Exhibit 2, pp. 10-18 of 38).  The Appeals Council denied Plaintiff's request for review on October 3, 2009 in Spanish and English (Docket No. 10, Exhibit 2, pp. 2 - 5 of 38).  Plaintiff filed a timely action seeking judicial review of the Commissioner's final decision.

## II. JURISDICTION

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).

## III. FACTUAL BACKGROUND

**A.  PLAINTIFF'S TESTIMONY.**

Plaintiff's counsel advised that Plaintiff was 51 years of age when he last worked on June 28, 2006.  He was 54 years of age at the time the administrative hearing was convened on March 26, 2009 (Docket No. 10, Exhibit 2, p. 22 of 38).  He resided with his brother and sister-in-law (Docket No. 10, Exhibit 2, p. 29 of 38).  Plaintiff had a driver's license and, apparently, he owned an automobile which his brother used (Docket No. 2, p. 32 of 38).

Plaintiff testified using the assistance of an interpreter.  He completed the ninth grade in the Commonwealth of Puerto Rico (Docket No. 10, Exhibit 2, p. 32 of 38).  Although his driver's test was administered in Spanish, Plaintiff testified that he could read traffic signs (in English)  (Docket No. 10, Exhibit 2, p. 32 - 33 of 38).

Plaintiff had been a painter for 26 years.  He stopped working as a painter on June 28, 2006.  As

2

a painter, Plaintiff stood, climbed ladders, stooped and lifted five to ten gallons (Docket No. 10, Exhibit 2, pp. 23 - 24 of 48).

Plaintiff suffered from constant back pain. As treatment, he took medication and rested "a lot" (Docket No. 10, Exhibit 2, p. 25 of 38). Sitting at the end of a chair with his hands on a table appeared to take the pressure off his back (Docket No. 10, Exhibit 2, p. 27 of 38). He could not bend (Docket No. 10, Exhibit 2, p. 29 of 38).

Plaintiff suffered from right knee pain and swelling. Sitting with his legs extended took the pressure off his knee (Docket No. 10, Exhibit 2, p. 26 of 38). Occasionally Plaintiff's feet would swell. Consequently, he would use crutches to walk (Docket No. 10, Exhibit 2, pp. 26, 32 of 38).

Plaintiff claimed that he suffered from episodes of anxiety which occurred when he was around people or became angry (Docket No. 10, Exhibit 2, p. 28 of 38).

Plaintiff cooked upon arising and paced during the day. He did not shop for groceries (Docket No. 10, Exhibit 2, p. 29-30 of 38).

During 2008, Plaintiff visited his mother in Puerto Rico for four days (Docket No. 10, Exhibit 2, p. 30 of 38). Occasionally, his brother drove him around the block to visit his sister (Docket No. 10, Exhibit 2, p. 31 of 38).

Plaintiff claimed that he had abstained from the use of alcohol for four months and cocaine for a year and seven months (Docket No. 10, Exhibit 2, pp. 30, 31 of 38).

**C.     VE TESTIMONY.**

The ALJ described Plaintiff's past relevant work of a painter as a skilled occupation. The work, as performed by Plaintiff, was classified as medium work. This work would not be transferrable to sedentary work (Docket No. 10, Exhibit 2, pp. 33, 34 of 38).

The ALJ requested that the VE consider an individual with the following characteristics:

- 51 years of age,
- a ninth grade education from a Puerto Rican school system,
- past relevant work as a painter,
- ability to lift and carry up to twenty pounds occasionally and lift and carry up to ten pounds frequently,
- inability to climb ladders, ropes or scaffolds,
- ability to stand and walk for six hours out of an eight hour workday,
- ability to sit for six hours out of an eight hour workday,
- limited to simple routine work,
- limited to instructions in simple English or Spanish or by demonstration, and
- ability to have superficial interaction with co-workers and the public without negotiation or confrontation.

This hypothetical individual could not return to Plaintiff's past relevant work of painter; however, this hypothetical individual could perform work as a housekeeper, car wash worker and assembly line worker (Docket No. 10, Exhibit 2, p. 34-35 of 38). Consistent with the Dictionary of Occupational Titles (DOT), there were in excess of 2,000 housekeeper jobs in the metro Cleveland economy, 9,200 in the State of Ohio and 246,000 in the national economy. Consistent with DOT, there were 892 car wash worker jobs in the metro Cleveland area, 7,100 in the State of Ohio and 112,000 in the national economy. Consistent with DOT, there were 8,600 assembly line worker jobs in the metro Cleveland economy, 58,000 in the State of Ohio and 844,000 in the national economy (Docket No. 10, Exhibit 2, p. 35 of 38). The ALJ refrained from asking a sedentary residual functional capacity (RFC) question, as Plaintiff had no transferrable skills; consequently, a sedentary RFC would lead to a finding of disability (Docket No. 10, Exhibit 2, p. 34 of 38).

### Iv. SUMMARY OF MEDICAL EVIDENCE

On August 9, 2004, Plaintiff was treated at the Norwalk Hospital Emergency Room for a painful and swollen right knee and a gout flare-up, (Docket No. 10, Exhibit 9, p. 14 of 15). Body fluid cultures showed no bacterial or other growth (Docket No. 10, Exhibit 10, pp. 12-13 of 18). The X-rays of the

right knee showed no evidence of fracture or dislocation. There were no significant degenerative changes but there was soft tissue swelling situated above and at or toward the midline of the knee (Docket No. 10, Exhibit 10, p. 14 of 18).

On September 7, 2005, Plaintiff was treated at the Norwalk Hospital Emergency Room for painful swelling in the right knee for two days. The swelling was attributed to a gout flare-up. Indocin, a medication designed to relieve moderate to severe pain, swelling and tenderness, was prescribed (Docket No. 10, Exhibit 9, pp. 3 - 13 of 15; www.nlm.nih.gov).

Plaintiff presented to MetroHealth Medical Center, an academic health care system located in Cleveland, Ohio, on August 24, 2006, for treatment of right knee and back pain. Plaintiff was diagnosed with gout in the ankle and sciatica on the right side. He was discharged with a narcotic pain medication, a nonsteroidal anti-inflammatory drug and an adjunct measure to induce rest and physical therapy (Docket No. 10, Exhibit 8, pp. 2 - 7 of 15).

On October 11, 2006, Plaintiff was advised to continue pain medications and muscle relaxers to relieve the low back pain and pain arising from sciatica.

On October 13, 2006, there were three views taken of Plaintiff's lumbar spine, neither of which showed fractures, dislocations nor lesions. There were, however, mild degenerative changes with atherosclerotic calcification of the aorta (Docket No. 10, Exhibit 11, p. 4 of 38).

Plaintiff presented to MetroHealth on October 25 and November 22, 2006, with a gradually worsening course of back pain. Tests were ordered and medication was prescribed to control Plaintiff's blood pressure. Dr. Christopher Gillespie stressed the importance of back protection and a regular program for improving back strength (Docket No. 10, Exhibit 8, pp. 11 - 12 of 15). It was further noted that Plaintiff had hyperlipidemia (Docket No. 10, Exhibit 11, p. 9 of 38).

On November 1, 2006, a short-term plan to decrease pain was employed. Plaintiff was scheduled to see a therapist one to two times weekly for ten visits for range of motion, strengthening, flexibility and functional training. During the fourth visit, "the gout was much better" but the pain had migrated to his left leg. At the seventh visit, Plaintiff reported no improvement in the symptom or intensity of the pain (Docket No. 10, Exhibit 11, pp. 10 - 20 of 38).

The results from the magnetic resonance imaging (MRI) of Plaintiff's lumbar spine administered on December 1, 2006, showed mild degenerative spondylosis at L3-L4 and L4-L5 (Docket No. 10, Exhibit 11, p. 5 of 38).

On December 20, 2006, Plaintiff was treated for back pain. Dr. Christopher Gillespie reinforced back protection and recommended a regular program at the Ortho Spine Clinic designed to improve back strength and flexibility (Docket No. 10, Exhibit 8, pp. 9 -10 of 15).

Dr. Gillespie determined on January 31, 2007, that Plaintiff's control of hypertension was poor; consequently, he gave Plaintiff samples of hypertension medication and counseled Plaintiff on managing his hypertension (Docket No. 10, Exhibit 8, p. 8 of 15).

On February 16, 2007, Plaintiff reported shortness of breath during sleep time and elevated lipid levels (Docket No. 10, Exhibit 20, p. 21 of 21).

On February 22, 2007, Plaintiff presented to MetroHealth for an evaluation of back pain relating to the right leg and foot. Dr. Robert N. Coals diagnosed Plaintiff with degenerative disc disease and low back pain (Docket No. 10, Exhibit 21, p. 25 of 25).

On March 26, 2007, there was evidence of a minimal narrowing of the medial aspect of the knee joint space (Docket No. 10, Exhibit 21, p. 23 of 25). ,

6

On April 4, 2007, Dr. Omid Rashidi noted the presence of mild degenerative spondylosis at L3-L4 and L4-L5. The back pain was tolerable (Docket No. 10, Exhibit 20, p. 9 of 20).

During the fifth of nine therapy sessions which commenced in August 2007, Plaintiff's pain scale was a six out of ten (ten being more severe) (Docket No. 10, Exhibit 19, p. 18). However, during the seventh session, Plaintiff admitted that his pain had decreased after exercising and applying cold packs (Docket No. 10, Exhibit 19, p. 14 of 30).

On November 25, 2007, Plaintiff was diagnosed with gastrointestinal reflux disease (Docket No. 10, Exhibit 19, p. 4 of 30).

Plaintiff was treated for a panic attack on December 10, 2007 (Docket No. 10, Exhibit 18, p. 12 of 18). Plaintiff's medications were altered on December 11, 2007, in contemplation that new medication might stop exacerbating his moods and inducing a manic state. Klonopin was prescribed to calm Plaintiff and allow him to rest (Docket No. 10, Exhibit 18, p. 8 of 18).

On December 19, 2007, Plaintiff underwent thirty minutes of psychotherapy prior to medication follow up. A sleep aid prescription was continued (Docket No. 10, Exhibit 18, p. 4 of 18).

Plaintiff was treated for bilateral knee pain and tightness on January 9, 2008. Upon examination, the attending physician attributed the irregularity to muscle pain (Docket No. 10, Exhibit 18, p. 2 of 18).

Plaintiff presented to MetroHealth on January 28, January 30, February 1 and February 18, 2008, and related complaints of pain and/or swelling associated with gout, low back and feet (Docket No. 10, Exhibit 17, pp. 12 - 18 of 24).

On February 14, 2008, a psychopharmacology treatment plan was created by Dr. Haojiang Huang in which supportive psychotherapy techniques were used to monitor Plaintiff's symptoms, side effects and adjust the dosage of medication as needed. In addition, Plaintiff's life circumstances were

discussed (Docket No. 10, Exhibit 17, p. 8 of 24).

On July 4, 2008, x-rays of Plaintiff's extremities showed no evidence of erosive arthropathy on either side. There was evidence of mild osteoarthritis of both first metatarsus and phalanges of the toes (Docket No. 10, Exhibit 21, p. 16 of 25).

Dr. Marina N. Magrey evaluated Plaintiff's gout on July 6, 2008 (Docket No. 10, Exhibit 16, p. 4 of 24).

Plaintiff was treated on September 7, 2008, for acute arthritis in the right ankle (Docket No. 10, Exhibit 14, p. 16 of 20). Contemporaneously with medical treatment, Plaintiff was undergoing physical therapy. At the conclusion of his fourth visit with a physical therapist on August 7, 2008, Plaintiff was still experiencing "so much pain" (Docket No. 10, Exhibit 15, p. 19 of 22).

Dr. Enedina Berrones treated Plaintiff during September and October 2008 for issues related to anxiety, alcohol dependence and cocaine abuse. A depression medication was prescribed as well as continued psychotherapy (Docket No. 10, Exhibit 13, p. 29 of 29; Exhibit 14, pp. 2 - 13 of 20).

On September 10, 2008, Dr. Omid Rashidi treated Plaintiff for gout arthropathy with prednisone. Additionally, pain relievers were prescribed (Docket No. 10, Exhibit 14, p. 10 of 20).

Dr. Magrey confirmed on September 19 and November 19, 2008, the presence of a tiny heel spur, interval decrease in joint effusion and mild osteoarthritis bilaterally in Plaintiff's hands and feet (Docket No. 10, Exhibit 13, pp. 19-25 of 29; Exhibit 15, pp. 2-6 of 22).

On November 20, 2008, Plaintiff was diagnosed with minimal osteoarthritis bilaterally, especially involving the medial knee joint compartments (Docket No. 10, Exhibit 21, p. 13 of 25).

Plaintiff underwent a medication follow-up and supportive psychotherapy on December 16, 2008. Dr. Berrones increased medication designed to decrease anxiety (Docket No. 10, Exhibit 13, p.

18 of 29). On January 19, 2009, Dr. Magrey conducted a follow-up examination on joint pain and gout. The x-rays of both hands and wrists showed no evidence of erosive arthropathy. There was evidence of mild osteoarthritis bilaterally in Plaintiff's hands and first metatarsophalangeal joints in the feet. Mild degenerative spondylosis was evidenced at L3-L4 and L4-L5 (Docket No. 10, Exhibit 13, pp. 10 - 16 of 29).

On January 27, 2009, Plaintiff underwent thirty minutes of psychotherapy with Dr. Berrones. Plaintiff was diagnosed with anxiety disorder, depressive disorder and alcohol dependence. The focus of this intervention was to prevent a relapse and identify triggers (Docket No. 10, Exhibit 13, pp. 7-9 of 29).

On February 24, 2009, Dr. Berrones diagnosed Plaintiff with a depressive disorder, an anxiety disorder and alcohol dependence. It was her opinion that Plaintiff had a marked limitation of his ability to:

- remember locations and work-like procedures,
- understand and remember very short and simple instructions,
- carry out simple instructions,
- maintain attention and concentration for extended periods,
- sustain an ordinary routine without special supervision,
- work in coordination with or proximity to others without being unduly distracted
- make simple work-related decisions,
- accept instructions and respond appropriately to criticism from supervisors,
- get along with co-workers or peers without unduly distracting them,
- maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness,
- relate predictably in social situations, and
- be aware of normal hazards.

Dr. Berrones also opined that Plaintiff had an extreme limitation in his ability to:

- complete a normal workday and workweek without interruption,
- interact appropriately with the general public,
- respond appropriately to changes in the work setting, and
- travel in unfamiliar places or to use public transportation.
- interact appropriately with the general public and an extreme ability to complete a

9

>    normal workweek without interruptions.

(Docket No. 10, Exhibit 12, pp. 2 - 6 of 9).

Dr. Rashidi diagnosed Plaintiff with gout on February 11, 2009. The levels of Plaintiff's blood pressure were elevated (Docket No. 10, Exhibit 13, p. 2 of 29). Based on this diagnosis, Dr. Rashidi opined that:

- Plaintiff's maximum continuous ability to stand or walk at one time in an eight-hour workday, was fifteen minutes or less,
- Plaintiff's total cumulative time standing in an eight-hour workday was one hour or less,
- Plaintiff's maximum continuous ability to sit at one time in an eight-hour workday was one hour,
- Plaintiff's total cumulative time sitting in an eight-hour workday was three hours,
- Plaintiff needed to lie down at unpredictable intervals during the eight-hour workday,
- Plaintiff suffered severe tenderness in the paraspinal muscles,
- Plaintiff suffered severe pain and tenderness in the right foot,
- Plaintiff could occasionally lift up to ten pounds, stoop and balance,
- Plaintiff was likely to be absent from work more than four times monthly, and
- Plaintiff suffered side effects from the medication prescribed to treat the symptoms of gout, specifically, gastrointestinal bleeding and sleepiness.

(Docket No. 10, Exhibit 12, pp. 6 - 9 of 9).

### v.  STANDARD OF DISABILITY

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); See also 20 C.F.R. § 416.920)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id*. (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920

respectively. To assist clarity, the remainder of this Report and Recommendation references only the DIB regulations, except where otherwise necessary.

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.* A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

### VI. ALJ DETERMINATIONS

After consideration of the entire record, the ALJ made the following findings of facts:

1. Plaintiff met the insured status requirements of the Act through December 31, 2011.

11

2. Plaintiff had not engaged in substantial gainful activity since June 28, 2006, the alleged date of onset.

3. Plaintiff had severe impairments including bilateral arthritis of the knees, lumbar degenerative disc disease, degenerative joint disease of the left ankle, bilateral osteoarthritis of the hands and wrist, anxiety disorder, not otherwise specified, mood disorder, alcohol dependence and cocaine abuse. These impairments, individually and in combination with each other, did not meet or medically equal one of the listing impairments in 20 C. F. R Part 404, Subpart P, Appendix 1.

4. Plaintiff had the RFC to perform light work, specifically, he could lift, carry, push and pull up to ten pounds frequently and twenty pounds occasionally. Plaintiff could sit, stand, and walk up to six hours each in an eight-hour workday with normal breaks, he could perform no more than simple routine work with instructions in Spanish, simple English or by demonstration. Plaintiff could have no more than superficial interaction with co-workers and the public without negotiation or confrontation.

5. Plaintiff was unable to perform any past relevant work.

6. Plaintiff, an individual closely approaching advanced age, had a limited education and was able to communicate in English. Considering his age, work experience and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the Plaintiff could perform.

7. Plaintiff was not under a disability as defined in the Act from June 28, 2006 through May 7, 2009.

(Docket No. 10, Exhibit 2, pp. 10-18 of 38).

### VII. STANDARD OF REVIEW

The district court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *McClanahan, supra*, 474 F.3d 830 at 833 (*citing Branham v. Gardner*, 383 F.2d 614, 626-627 (6th Cir. 1967)). In fact, the Commissioner's findings as to any fact shall be conclusive if supported by substantial evidence. *Id.* (*citing* 42 U.S.C. § 405(g )). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Besaw v. Secretary of Health and Human Services*, 966

F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)). Therefore the reviewing court may not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994) (*citing Brainard v. Secretary of Health and Human Services*, 889 F. 2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F. 2d 383, 387 (6th Cir. 1984)).

### VIII. PLAINTIFF'S POSITIONS.

1.  Plaintiff argues that this case warrants remand because the jobs cited by the VE presume an ability to read English.

2.  Plaintiff argues that the ALJ committed legal error when he failed to include all of his functional limitations in the residual functional capacity.

3.  Plaintiff argues that the ALJ's decision does not comply with SSR 96-5p and SSR 96-2p.

### IX. DEFENDANT'S POSITIONS

**1.**  Defendant concedes that Plaintiff mainly spoke Spanish as his first language; however, Plaintiff has a rudimentary knowledge of English and he can communicate in English. Defendant directs the Court to consider he was able to read street signs and he was able to communicate well during an agency employee driven interview and he used interpreters during three psychiatric appointments and one medical appointment.

2  The ALJ reasonably found Plaintiff capable of communicating in English and performing simple routine work with instructions in Spanish, simple English or by demonstration.

### X. ANALYSIS

1.  **PLAINTIFF'S LEVEL OF PROFICIENCY IN THE ENGLISH LANGUAGE.**

Plaintiff took his driver's license test in Spanish and he required the use of a translator to communicate at the administrative hearing. The evidence indicates that he is not proficient in the

13

English language.  At a minimum, this case should be remanded because the jobs cited by the VE, upon whom the ALJ relied, required the ability to read English.

When assessing educational levels, the ALJ must consider illiteracy or the inability to communicate in English.  "Illiteracy means the inability to read or write."  20 C.F.R. § 404.1564(b)(1) (Thomson Reuters 2010).  Someone is considered "illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name."  20 C. F. R. § 404.1564(b)(1) (Thomson Reuters 2010).  The regulations indirectly define ability to communicate as "the ability to speak, read and understand English."  20 C.F.R. § 404.1564(b)(5) (Thomson Reuters 2010).  Comprehension is factored into an analysis of the ability to communicate in English. 20 C.F.R. § 404.1564(b)(5) (Thomson Reuters 2010).  The regulations obligate ALJs to inquire into a claimants ability to "speak, understand, read and write in English."  20 C.F.R. § 404.1564(b)(6) (Thomson Reuters 2010).

When viewed in conjunction with the requisite legal standards for assessing literacy and language skills, Plaintiff's ability to speak, read and understand English is not well defined.  Plaintiff completed, in Spanish, his medical history and analysis for risk factors for heart attack on March 8, 2001 (Docket No. 10, Exhibit 11, pp. 25 - 33 of 38).  He updated his medical records, in Spanish, on March 8, 2004 (Docket No. 10, Exhibit 11, pp. 34-38 of 38).  Notations were made in the medical notes that referred to Plaintiff's nationality and his ability to speak Spanish (Docket No. 10, Exhibit 11, pp.19 of 38; Exhibit 15, pp. 19, 21, 22 of 22; Exhibit 16, pp. 4, 8 of 24).  Plaintiff was accompanied by a Spanish interpreter during consultations on February 22, 2007, January 16 and April 2, 2008.  The record does not show that Plaintiff had an interpreter for his other medical appointments although some of his treatment sources had Spanish surnames (Docket No. 10, Exhibit 16, p. 23 of 24; Exhibit 17, p. 23 of 24; Exhibit 21, p. 25 of 25).

Plaintiff's formal education of nine years in Puerto Rico was likely of limited value in assessing his present educational level or his ability to read, understand, speak and write English for purposes of the Social Security regulations.  During the hearing, the ALJ did not ask Plaintiff f he could read, write, speak or communicate in English.  Plaintiff did not speak English during the administrative hearing.  The ALJ asked Plaintiff if he could drive and read the street signs.  Plaintiff's retort, through an interpreter, was that he could identify and read the traffic signs.

The ALJ concluded that Plaintiff could read "a little" English as Plaintiff testified that he could read street signs.  However, the ALJ's inquiries fell short of ascertaining the extent of Plaintiff's comprehension of such signs.  The ability to read street signs is not precisely the same as an ability to read, comprehend English or write a simple message in English.  Plaintiff's abilities in English remain unqualified and undefined.

The Magistrate does not discount the ALJ's RFC finding that Plaintiff is limited to routine work with instructions in Spanish, simple English or by demonstration.  However, the ALJ failed to carry the burden of proof at stage five of the disability inquiry.  The lack of evidence as to Plaintiff's ability to communicate in English is construed as a failure to sustain the burden.  Because he ALJ failed to make and/or document the relevant inquiries regarding Plaintiff's literacy, his finding on this matter lacks substantial supporting evidence.  When such an evidentiary gap exists in the record, remand for the development of evidence is appropriate.

2. **PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY**.

Plaintiff challenges the ALJ's RFC calculation, claiming that the ALJ ignored the symptom-related functional limitations resulting from anxiety and mood disorder, bilateral osteoarthritis of the hands and wrists, the cyclical nature of gout and the need for ambulatory devices when his gout flares up.  The ALJ should have given the functional limitations identified by Drs. Berrones and Rashidi

15

deference.

A claimant's RFC is an indication of that individual's work-related abilities despite his limitations. *Garland v. Commissioner of Social Security Administration.* 2010 WL 3087464, *11 (N. D. Ohio 2010) (*see* 20 C.F.R. § 404.1545(a)(1)). A RFC finding is not a medical opinion, but an administrative determination reserved for the Commissioner. *Id.* (*see* 20 C.F.R. § 404.1527(e)(2)). Consequently, the ALJ bears the responsibility for assessing a claimant's RFC, based on *all* of the relevant evidence. *Id.* (*see* 20 C.F.R. § 404.1545(a)(3); TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, SSR 96-8p, 1996 WL 374184, *5 (July 2, 1996)).

The ALJ claimed that in assessing RFC, he considered all of the relevant evidence. The ALJ acknowledged the functional limitations provided by Drs. Berrones and Rashidi but discounted their opinions not supported by the treatment records (Docket No. 10, Exhibit 2, pp. 15 - 16 of 38). The ALJ determined that Plaintiff had a history of mild arthritis and its treatment (Docket No. 10, Exhibit 2, p. 16 of 38). The ALJ acknowledged that Plaintiff underwent treatment to control anxiety and mood disorders. The ALJ even considered the effect that such disorders had on Plaintiff's activities of daily living, concentration, persistence, social interaction and adaptation (Docket No. 10, Exhibit 2, p. 15 - 16 of 38). The ALJ considered the medical treatment for gout and determined that it "waxes and wanes," and that occasionally Plaintiff needed an ambulatory aid to ambulate effectively during gout attacks even though there was no medical documentation establishing its need (Docket No. 10, Exhibit 2, p. 15 of 38; TITLES II AND XVI: DETERMINING CAPACITY TO DO OTHER WORK–IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, SSR 96-9p, 1996 WL 374185, *7 (July 2, 1996)). He concluded that these limitations had a minimal effect on Plaintiff's ability to perform basic mental and physical work activities (Docket No. 10, Exhibit 2, p. 12 of 38). Moreover, the ALJ reported that he itemized Plaintiff's various functions consistent with SSR 96-8p

(Docket No. 10, Exhibit 2, p 14 of 38).

The ALJ considered the impairments and their functional limitations in assessing Plaintiff's capacity for work once his limitations had been taken into account. The Magistrate concludes that the ALJ's finding should be upheld as he complied with the correct legal standard and drew conclusions based on substantial evidence.

**3.    MEDICAL EVIDENCE EVALUATION CONSISTENT WITH THE REGULATIONS.**

Plaintiff contends that ALJ failed to attribute controlling weight to the opinions of Drs. Rashidi and Berrones consistent with SSR 96-2p and SSR 96-5p.

**a.    SSR 96-2p.**

TITLE II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, SSR 96-2p, 1996 WL 374188. *1 (July 2, 1996), explains that a case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion. Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources. *Id*. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well- supported by medically acceptable clinical and laboratory diagnostic techniques. *Id*. Even if a treating source's medical opinion is well- supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record. *Id*. The judgment whether a treating source's medical opinion is well-supported and consistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify. *Id*. If a treating source's medical opinion is well- supported and consistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted. *Id*.

In this case, the ALJ claimed that his findings were made in accordance with SSR 96-2p. He

17

did not unilaterally reject the opinions of Drs. Berrones and Rashidi. He attributed controlling weight to the opinions of Drs. Berrones and Rashidi in their diagnoses and treatment. He discounted their opinions when assessing RFC. The ALJ explained that Dr. Berrones conclusions were not supported by the treatment records. Thus, he attributed less weight to her reports. Similarly, he did not credit the source statements of Dr. Rashidi as they were inconsistent with Plaintiff's own reports of functioning. In both cases, the physicians' reports of functional limitations were contrary to clinical signs and/or laboratory findings. The ALJ identified the reports of Drs. Rashidi and Berrones as being inconsistent and discounted those opinions not supported by substantial evidence. The ALJ attributed controlling weight to those reports that were supported by the treatment records (Docket No. 10, Exhibit 2, p. 16 of 38).

### b. SSR 96-5p

Plaintiff argues that if the treating physician opinions were inconsistent, not complete or inadequately supported, the ALJ had a duty to recontact the treating physicians according to SSR 96-5p.

Treating source opinions on issues reserved for the Commissioner will never be given controlling weight. TITLES II AND XVI: MEDICAL SOURCE OPINIONS ON ISSUES RESERVED TO THE COMMISSIONER, SSR 96-5P, 1996 WL 374183, *6 (July 2, 1996). The following are examples of such issues reserved for the Commissioner:

- Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
- What an individual's RFC is;
- Whether an individual's RFC prevents him or her from doing past relevant work;
- How the vocational factors of age, education, and work experience apply; and
- Whether an individual is "disabled" under the Act.

*Id.* at *2.

Because treating source evidence (including opinion evidence) is important, if the evidence does

not support a treating source's opinion on any issue reserved for the Commissioner **and** the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion. *Id.* at *2.

The conclusions drawn by the ALJ on Plaintiff's RFC was inconsistent with the conclusions made by Drs. Berrones and Rashidi on Plaintiff's RFC. However, the differences between the issues reserved for the Commissioner's consideration and the opinions of Drs. Rashidi and Berrones on the issue of RFC were readily quantifiable; consequently, the ALJ was able to ascertain the basis of the opinion from the case record and explain why he did not adopt this analysis. The ALJ was not required to recontact Drs. Rashidi and Berrones for clarification.

## XI. CONCLUSION

For the foregoing reasons, the Magistrate recommends that the Court remand this case to the Commissioner, pursuant to sentence four of 42 U. S. C. § 405(g), to assess Plaintiff's level of education and whether considering his age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Dated: January 27, 2011

## XII. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO,

as amended on December 1, 2009, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.